McKEE, Circuit Judge, Concurring.
 

 I agree with my colleagues' conclusion that evidence defense counsel was aware of, but failed to present, can satisfy the new evidence requirement of
 
 Schlup v. Delo.
 

 [1]
 
 However, I write separately to emphasize the weight of the evidence that supports Reeves's claim of actual innocence, and the questionable nature of the investigation that resulted in the conviction of someone who may well have languished in a prison cell for eight years for a murder that was most probably committed by someone else.
 

 The circumstances leading to Reeves's conviction are summarized in my colleagues' thoughtful opinion along with much of the evidence that supports his claim of actual innocence. Indeed, the case in support of Reeves's claim of actual innocence is so substantial that a group consisting of retired federal judges, former federal prosecutors, and a former member of the Office of the Pennsylvania Attorney General's Office, has filed an amicus brief on his behalf.
 
 [2]
 
 Yet, as I shall discuss, for some inexplicable reason, police simply refused to follow even the most obvious leads that did not confirm their suspicion that Reeves was the killer. They did eventually obtain a confession from Reeves. However,
 given the totality of the circumstances here, that confession does not negate his claim of actual innocence.
 

 I.
 

 Shortly after the May 25th, 2006 robbery of the City Gas & Diesel described in the majority opinion, Jerry Reeves, who was then just eighteen years old, was arrested at a city park in Harrisburg, Pennsylvania. He was not arrested because police suspected him of being involved in the fatal robbery of City Gas & Diesel. Rather, he was arrested for throwing a rock onto a miniature golf course and hitting someone in the leg. While in his jail cell, Reeves was approached by Officer Derek Fenton. Fenton did not approach Reeves based on any suspicion that Reeves was involved in the fatal shooting. Rather, Fenton fancied himself a bit of a sleuth and prided himself on his ability to ferret out information. He testified that he went to Reeves in his jail cell because he, Fenton, believed himself to have "an excellent rapport with our detective division for the intelligence [he was] able to gather."
 
 [3]
 
 In Fenton's words, he approached Reeves because: "You don't know until you try and anyone you encounter on the street, you just strike them a conversation."
 
 [4]
 
 Reeves, who had been adopted out of foster care, and had a history of lying, was eager to get out of jail and go home for a family cookout the next day. Thus, Fenton's instincts appeared to pay off.
 

 Reeves told Officer Fenton that he had witnessed the robbery from across the street. He even identified the robber. Reeves told Fenton that the robber was a man named Jermaine Taylor, who was six feet tall with brown skin. Reeves would later testify at his trial that that was a lie. The police had apparently told Reeves that if he "had info they would let [him] out," and Reeves wanted to be released so he could get home in time for the aforementioned cookout.
 
 [5]
 
 He testified: "I ha[d] not seen my family in a while, so I wanted to see them." "That is why I lied."
 
 [6]
 
 As promised, the police released him after the conversation with Officer Fenton and he attended his family's cookout.
 

 In the meantime, a "very excited" Officer Fenton notified the detective bureau.
 
 [7]
 
 Fenton told Detective Christopher Krokos, the lead detective on the City Gas & Diesel homicide, about Reeves's story. Krokos understandably followed up by contacting Reeves who agreed to come to the police station to be interviewed on May 30th, five days after the robbery. Once more, Reeves repeated that a six-foot-tall, brown-skinned, Black male named Jermaine Taylor had been the robber. This time he added a detail that police knew was not true. Even though the surveillance video depicted the shooter leaving the scene alone and on foot, Reeves stated that he had seen the robber run out of the store and get into a dark-colored Buick with lightly tinted windows and three other passengers.
 

 Detective Krokos would later write in his daily report that Reeves's adoptive father, Terrie Reeves, had informed the detective that Reeves had admitted to lying about witnessing the robbery. Krokos also noted in his report that Reeves's father had cautioned Reeves not to lie again to the police.
 
 [8]
 

 Nevertheless, at this point, Krokos confronted Reeves about his untruthfulness. Reeves then revised his story and said that he had heard the shooting but had not actually seen it. To make things worse for Reeves, he admitted that Jermaine Taylor, the man he claimed had been the robber, "was someone he made up," and that "none of the information he gave [Krokos] was true." Reeves's admission that he had been lying clearly gave police reason to suspect that he might have been involved. As a result of that admission, Reeves was charged with hindering apprehension, and the investigation continued.
 

 Police had already received a number of leads pointing in a different direction that should have, at the very least, cautioned against myopically focusing on Reeves. The very same day of the robbery, staff at the county work-release center in Harrisburg had informed police that two work-release clients-Kai Anderson and Michael Holmes-had escaped the night of the robbery. Anderson fit the description of the robbery suspect, and the work-release staff told police that it was "very coincidental" that Anderson and Holmes escaped the same night the robbery occurred. The work-release staff also provided police with photos and information about Anderson to aid in pursuing him.
 

 Next, Kimberly Clark, the grandmother of Anderson's child, had independently called police to tell them that Anderson had been making minute-long calls to her daughter, Danielle Ignazzito, several times a day and had been "act[ing] mysterious[ly]."
 
 [9]
 
 Clark also reported that Anderson had told Ignazzito that "he's on the run and or is wanted."
 
 [10]
 

 Then came a third tip about Anderson. Ignazzito, Clark's daughter and the mother of Anderson's son, had initially been "afraid" to give police information about Anderson's whereabouts.
 
 [11]
 
 But on May 29th, just four days after the robbery, Ignazzito told police that Anderson had called her several times to say that he had a lot of money to give her for their child. Ignazzito said she had also spoken to Kenneth Marlow, a friend of Anderson's. Marlow told her that Anderson was in trouble, that Anderson had fled to Ohio with Michael Holmes (who had escaped from the work-release center with Anderson), and that Anderson was being sought by police in connection with the City Gas & Diesel homicide.
 

 Six days after the robbery, police arrested Anderson for escaping from the work-release center. Detective Krokos took the opportunity to interview Anderson, just as he had interviewed Reeves a few days earlier. The interview was unfruitful. Anderson confirmed that he had escaped from the work-release center but denied any involvement in the robbery. He did, however, confirm that he had asked Marlow to call Ignazzito, just as Ignazzito had told Krokos. Yet it is not clear if he also confirmed that he had expressed concern about being connected to the robbery, as Ignazzito had reported. Anderson did admit that he had been "in the area of Linden St[.] and Walnut St."-just a few blocks away from the City Gas & Diesel-on the night of the robbery.
 
 [12]
 
 He also said that he had encountered the real robber there and actually heard that person confess to the crime. Despite information placing him near the crime scene, and the
 three independent tips at least suggesting that further investigation into Anderson was warranted, it does not appear that suspicion ever turned from Reeves to Anderson (or to anyone else).
 

 Then came a fourth tip. A week after interviewing Anderson, Detective Krokos interviewed Marlow. Marlow admitted calling Ignazzito on Anderson's behalf, as Ignazzito had reported, and to telling Ignazzito that Anderson was on the run. Marlow also said that Anderson was "involved in the robbery/homicide at the City Gas & Diesel on State St."
 
 [13]
 
 Marlow even told Krokos that he heard Anderson admit his involvement. According to Marlow, Anderson had said that he (Anderson) "got a gun[,] went to the gas station[,] and shot the dude and robbed him."
 
 [14]
 

 Thus, Detective Krokos now had information implicating Anderson from not two, not three, but
 
 four
 
 sources-the work-release center staff, Clark, Ignazzito, and now Marlow. Yet, for reasons that are not at all clear on this record, the investigation continued to focus on Reeves. There is more.
 

 Approximately a month after the robbery, another witness, Johnathan Johnston, came forward. Johnston and Anderson had known each other for over fifteen years and had reunited at Dauphin County Prison after Anderson's arrest for escaping from the work-release center. Johnston told Krokos that Anderson had admitted involvement in the City Gas & Diesel robbery while they were in the County Prison. Johnston's statement about Anderson's confession should have been taken particularly seriously because, unlike the stories that Reeves gave Krokos, Anderson's purported statements to Johnston included subtle details about the robbery, many of which were unknown to the public.
 
 [15]
 
 Specifically, Johnston said that Anderson had told him that (1) the shooter needed to be small enough to fit through the gap in the bullet-proof glass window to get to the other side of the counter; (2) the shooter was wearing all black; and (3) the shooter left the store on foot heading west. Johnston's statements to Krokos contained other indicia of reliability: Johnston knew that Anderson had admitted his involvement to Marlow, and that Marlow had repeated Johnston's inculpatory statement to Ignazzito.
 

 Johnston told Krokos something else that the detective inexplicably ignored. According to Johnston, "[Anderson] knew he could beat [the evidence in the surveillance video] he just need somebody talk to [Ignazzito] so she can, don't say nothing and get scared because the cops already tried to scare her."
 
 [16]
 
 Indeed, Johnston said that Anderson had also asked him (Johnston) to
 have his wife threaten Ignazzito not to give the police any more information about Anderson and the City Gas & Diesel homicide. Finally, Johnston said that Anderson told him that after "the gun went off[,] the [clerk] fell then got back up and he fell again."
 
 [17]
 
 That detail was visible in surveillance videos of the crime, but had not been made public. Again, for reasons that are not at all apparent on this record, Krokos failed to pursue Anderson as a suspect, and the investigation began to "stall."
 
 [18]
 

 Despite information that directly implicated Anderson and despite the police learning that Anderson knew subtle details about the robbery, the investigation appears to have simply gone dormant for three years. Then, serendipity unfortunately placed Reeves in Detective Krokos's crosshairs yet again. In July of 2009, Reeves, who was now twenty-one years old, had been arrested with his girlfriend after an incident at a bar. Upon learning of Reeves's arrest, and despite all of the evidence pointing toward Anderson, Krokos took the opportunity to speak with Reeves once more about the City Gas & Diesel robbery. At his trial, Reeves testified that he agreed to be interviewed again because he wanted to keep his pregnant girlfriend-with whom he had been arrested-from going to prison and was told that the officers would "see what they could do" if he talked to them.
 
 [19]
 

 Reeves offered the same story about having witnessed the crime that he had given Krokos three years earlier. However, this time Reeves said that two men, not one, had robbed the store and that Reeves's own cousin had stood outside as a lookout. Again, Krokos pressed Reeves on his lack of truthfulness. The video showed that only one man had robbed the store. Reeves responded by changing his story yet again. This time, he stated he was not actually across the street when he saw the shooting, but was in a parking lot near the payphone; that he spoke to his cousin about the imminent plan to rob the store; and that it was an unknown male who actually went inside. The questioning continued until Reeves finally asked, "[W]hat if I was in the store when it happened then what[']s that?"
 
 [20]
 
 The police report states:
 

 Reeves was confronted with the fact that if other people are involved they may talk to us about the incident. He was asked what [are Reeves's cousin and the other individual Reeves named] going to say if asked about this incident? Reeves stated that they will say that it was me who did it. Reeves then began to become concerned that he would not see his unborn child if he told us what occurred. Reeves was further questioned.
 

 Reeves then began to visibly shake and tremble. He began to cry.
 
 [21]
 
 Then Reeves "confessed." He said that he robbed the store because he needed money; that he knew the people in the store because he used to sweep the floors for them; that he got a gun but that he did not know the make or caliber; and that he had been given the gun the same day by someone in Baltimore, Maryland.
 

 Reeves then provided details on the robbery, many of which were prompted by leading questions from Krokos and his team. They posed questions to confirm that, like the robber in the video, Reeves had also jumped over the counter:
 

 Q. ... Do you remember did you jump up or do anything in the store?
 

 A. I think I jump behind the counter.
 
 [22]
 

 They asked questions to corroborate the fact that bullet-proof plastic separated the robber from the clerk:
 

 Q. Okay what was separating customers from behind the register?
 

 A. Glass[.]
 

 Q. Was it glass or plastic or?
 

 A. Probably bullet proof plastic or something.
 
 [23]
 

 They verified that Reeves's gun matched the gun used:
 

 Q. And describe the gun again what color was it?
 

 A. All black[.]
 

 Q. And it was a semi-automatic not a revolver.
 

 A. Semi-automatic yes.
 
 [24]
 

 They asked Reeves to specify that he had acted alone:
 

 Q. And just, just so we're clear you were the only one involved in this there was nobody else involved in this incident?
 

 A. No not at all.
 
 [25]
 

 And they repeatedly pressed Reeves on whether he had worn something to disguise his face, as the robber had done in the video:
 

 Q. Okay so what are you wearing when you go in the store?
 

 A. Black, black pants, black t-shirt.
 

 Q. Are you wearing a mask? Do you remember?
 

 A. No I don't remember if I had a mask on or not probably, probably did, no I didn't have a mask on.
 

 Q. You didn't have a mask on?
 

 A. No[.]
 

 A. Did you have gloves?
 

 Q. I think so, I think so probably.
 

 ...
 

 Q. Did [the store clerk] recognize you?
 

 A. Most likely yes. He seen me plenty of times before that so if I wasn't wearing a mask yes.
 

 Q. [S]o what you're saying is you don't remember whether or not you were wearing ...
 

 A. [INAUDIBLE] masks or gloves that night.
 

 Q. Okay, those are the two things you don't remember whether or not you were wearing that night.
 

 A. Yes[.]
 

 Q. Just for the tape I'm not sure it got ah on there clearly, you don't remember if you were wearing a mask or gloves?
 

 A. No[.]
 
 [26]
 

 Despite obtaining what purported to be a confession, Krokos either ignored or did not credit some rather remarkable discrepancies between Reeves's account and the actual facts of the robbery. Reeves said that he struggled with the clerk before the shooting. Yet the surveillance video shows that the clerk and the robber never even touched one another.
 
 [27]
 
 Reeves said he ran
 towards Boas Street, which is north of the City Gas & Diesel, while the actual robber headed in a westerly direction, according to the surveillance video. Reeves also said he did not remember if he had gotten anything from the store after firing the gun, though the real robber left with a bag full of money from the cash register. Finally, Reeves said the gun he used "looked like a [ ]9" millimeter,
 
 [28]
 
 which is the same caliber as a .357, but the actual gun used was a much smaller, .25 caliber.
 

 Most significantly, in the video, the shooter appears to be right-handed. He removed the pistol from the front of his pants with his right hand then brandished it in his right hand. He switched the gun to his left hand only after the clerk had been shot and he needed his right hand to finish taking money from the register and from the floor. Once he had collected the money, he used his right hand to jump back over the counter. It is uncontested that Reeves is left-handed, and he has offered affidavits from people who knew him as a child to corroborate that.
 
 [29]
 

 Of course, police may not have noticed that Reeves was left-handed during the numerous times they interacted with him and it would have been understandable to simply assume, absent a reason to suspect otherwise, that he was right-handed. This is particularly true in light of his confession and his prior interviews, which continuously resulted in what can only be described as false exculpatory statements.
 

 However, as I have already detailed, police had to ignore several leads to even get to the point of Reeves's confession three years after the fatal robbery. These leads included evidence that Anderson had admitted his involvement in the crime to two people; that he had suddenly come into a significant sum of money; that he had escaped from the work-release center on the night of the robbery; and that he had been in the vicinity of the robbery that night. Anderson had also tried to have someone threaten Ignazzito to keep her from saying anything more about his involvement in the robbery, and he had made statements revealing a detail about the robbery not known to the general public. Yet, during the three-year lapse in this investigation, it does not appear that police did anything to pursue the evidence of Anderson's involvement before initiating the discussion with Reeves that ultimately led to the statement that resulted in his conviction for the fatal robbery. Given this record, as I noted at the outset, Reeves's apparent confession does not negate the claim of actual innocence based on newly discovered evidence under
 
 Schlup v. Delo
 
 .
 
 [30]
 

 Reeves would not be the first person to
 have falsely confessed to a crime.
 
 [31]
 
 According to the National Registry of Exonerations, roughly half of individuals who have been exonerated following murder convictions involving DNA evidence in the United States since 1989, made a false confession.
 
 [32]
 
 In Pennsylvania, the rate of false confessions is comparable. Nearly half of individuals who have been exonerated with DNA evidence following a conviction for murder in Pennsylvania had confessed to those murders.
 
 [33]
 

 In referring to this data, I do not, of course, suggest that police should have completely ignored Reeves's confession. Rather, I refer to it simply to underscore that Reeves's confession does not negate his arguments under
 
 Schlup
 
 . I have already noted that absent the detective's inexplicable failure to pursue leads pointing to Anderson and the equally puzzling three-year gap in this investigation, there would have been no incriminating statement from Reeves.
 

 II.
 

 Reeves has now spent eight years in prison for this armed robbery and murder conviction, a fact that will hopefully inform the speed with which subsequent courts address his now likely procedurally-cognizable habeas claim.
 

 513 U.S. 298
 
 , 324,
 
 115 S.Ct. 851
 
 ,
 
 130 L.Ed.2d 808
 
 (1995).
 

 See
 
 Brief for Former Prosecutors, et al. as Amici Curiae Supporting Reeves 1.
 

 App. 307.
 

 Id.
 

 at 306
 
 .
 

 Id.
 

 at 318
 
 .
 

 Id.
 

 at 318
 
 .
 

 Id.
 

 at 307-08
 
 .
 

 Officer Fenton, Detective Krokos and Terrie Reeves were not the only individuals to have witnessed Reeves lying. His foster care reports described him as "deliberately untruthful" as a child and "often untruthful ... to avoid what would be minimal consequences."
 

 App. 137.
 

 Id.
 

 Id.
 

 Id.
 
 at 159.
 

 Id.
 
 at 165.
 

 Id.
 
 at 82.
 

 According to Johnston's statement, Anderson said he was "show[n]" the surveillance tape of the robbery during his interview with police. App. 93-94. The police report of Anderson's interview does not confirm that claim, nor does it suggest that any such viewing took place. However, the police reports indicate that police also showed the video to Xavier Henry, who had been identified as one of the City Gas & Diesel customers on the night of the robbery. Police did so in an attempt to identify Derrick Small, the only customer present in the City Gas & Diesel store when the robber entered. There is nothing in the record to establish any similar reason for showing the video to Anderson, who, as far as we know, had no information to identify Small or any other customer. Nor is it clear what portions of the video, if any, Anderson might have seen. The video is divided into multiple parts with footage from differing cameras both inside and outside of the store.
 

 App. 94.
 

 Id.
 
 at 97.
 

 Krokos conducted an interview with Michael Holmes in March of 2007, some nine months after the crime, but Holmes admitted only that he and Anderson had left the work-release center before the homicide. Holmes denied having ever even been in the City Gas & Diesel.
 

 App. 387-88.
 

 Id.
 
 at 198.
 

 Id.
 

 Id.
 
 at 106.
 

 Id.
 

 Id.
 
 at 108.
 

 App. 113.
 

 Id.
 
 at 105, 112.
 

 The clerk simply attempted to close the bullet-proof window separating the check-out counter from the customer area before the robber could point the gun through the window's opening.
 

 Id.
 
 at 108.
 

 Reeves offered testimony at trial that he was left-handed, but his trial counsel never offered evidence to corroborate that fact. Given his confession, the jury most likely simply discredited his uncorroborated testimony.
 

 513 U.S. at 324
 
 ,
 
 115 S.Ct. 851
 
 . I do not suggest that evidence of actual innocence must always be as strong as we have on this record before relief is available under
 
 Schlup v. Delo.
 
 Indeed, it can only be hoped that the kind of investigation that led to Reeves's confession, despite the strong evidence of someone else's guilt, will be exceedingly rare. Although the bar set by
 
 Schlup
 
 is a high one, it should not be raised so high that it becomes impossible to clear it. Nothing in
 
 Schlup
 
 leads me to conclude that the Court intended the interests of justice advanced by that case to be illusory in all but the most outrageous and extreme cases or that the accused must be able to prove actual innocence to a near mathematical certainty.
 

 During oral argument, counsel for Reeves was asked about the reported frequency of exonerations following false confessions. He subsequently submitted a reply pursuant to Fed. R. App. P. 28(j).
 
 See
 
 Appellant's May 28, 2018 Rule 28(j) Letter.
 

 Compare
 
 Murder Exonerations in the U.S., The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx (click "Murder" in "Crime" field; click "Present" button in the "DNA" field)
 
 with
 
 Murder Exonerations in U.S. with False Confessions, http://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx (click "Murder" in "Crime" field; click "Present" button in "False Confession" field; click "Present" button in the "DNA" field). As of May 28, 2018, nationally, the Registry has recorded 195 individuals that were convicted of murder in cases involving DNA evidence and that have since been exonerated. Of those exonerees, 43 percent, or 84 individuals, gave false confessions. These statistics were supplied by counsel in his May 28, 2018 Rule 28(j) letter.
 
 See supra
 
 note 8; Appellant's May 28, 2018 Rule 28(j) Letter 1-2.
 

 Compare
 
 Murder Exonerations in Pennsylvania, The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx (click "Pennsylvania" on interactive map; click "Murder" in "Crime" field)
 
 with
 
 Murder Exonerations in Pennsylvania with False Confessions, http://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx (click "Pennsylvania" on interactive map; click "Murder" in "Crime" field; click "Present" button in "False Confession" field; click "Present" button in the "DNA" field). The Registry has recorded 9 individuals that were convicted of murder in Pennsylvania and have since been exonerated in cases that involved DNA evidence. Of those exonerees, 44 percent, or 4 individuals, gave false confessions.
 

 As Brandon L. Garrett writes, there is a "new awareness among scholars, legislators, courts, prosecutors, police departments, and the public that innocent people falsely confess, often due to psychological pressure placed upon them during police interrogations." Garrett,
 
 The Substance of False Confessions
 
 ,
 
 62 Stan. L. Rev. 1051
 
 , 1052-53 (2010). Reeves's "trembl[ing]," tear-filled confession certainly bore the markings of such psychological distress. App. 198. He even attempted suicide in his cell just prior to having given the confession.